**Erwin PERZY, Plaintiff,**

v.

**INTERCARGO CORPORATION,**
**etc., Defendant.**

**No. 92 C 1479.**

United States District Court,
N.D. Illinois.

July 7, 1993.

As Corrected July 12, 1993.

Paul J. Kozacky, Jillisa Brittan, McDermott, Will & Emery, Chicago, IL, for plaintiff.

Warren J. Marwedel, Michael C. Neubauer, Keck, Mahin & Cate, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Erwin Perzy ("Perzy") brought suit under the federal admiralty jurisdiction against Intercargo Corporation ("Intercargo," formerly doing business as International Cargo & Surety Insurance Company), charging it with breach of its obligations under a marine insurance contract and advancing a supplemental jurisdiction claim (see 28 U.S.C. § 1367) for attorneys' fees for vexatious and bad faith denial of his insurance claim pursuant to a section of the Illinois Insurance Code, 215 ILCS 5/155 ("Section 155"). Both sides now

move for summary judgment. For the reasons stated in this memorandum opinion and order, Intercargo's motion is denied, while Perzy's motion is granted in principal part but denied as to the remainder.

### Rule 56 Standards

Rule 56 principles impose on each movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) (citations omitted)). Where as here cross-motions are involved, that principle thus demands a dual perspective—one that this Court has often described as Janus-like—that sometimes involves the denial of both motions.

Under the Illinois case law allocating the burden of proof in insurance cases such as this, "existence of coverage is an essential element of the insured's case, and the insured has the burden of proving that his loss falls within the terms of the policy" (*St. Michael's Orthodox Catholic Church v. Preferred Risk Mut. Ins. Co.*, 146 Ill.App.3d 107, 109, 100 Ill.Dec. 111, 113, 496 N.E.2d 1176, 1178 (1st Dist.1986)). On the other hand, the burden then rests with the insurer to show that it is free from doubt that the insured's claim falls within an exclusion from policy coverage (*id.; Dungey v. Haines & Britton, Ltd.*, 224 Ill.App.3d 1091, 1094, 167 Ill.Dec. 204, 206, 587 N.E.2d 86, 88 (5th Dist.1992)).

### Citations to the Parties' Submissions

This District Court's General Rule ("GR") 12(m) and 12(n) require factual statements in support of and in opposition to Rule 56 motions, and both sides have tendered such statements. Intercargo's statement in support of its motion is cited "D. 12(m) ¶ —,"

while Perzy's responsive statement is cited "P. 12(n) ¶ —." Perzy's statement of other facts in support of his cross-motion is cited "P. 12(m) ¶ —," and Intercargo's responsive statement is cited "D. 12(n) ¶ —." To minimize confusion, the numbering of the statements in support of and in opposition to Perzy's cross-motion begins at the point where the statements in support of and in opposition to Intercargo's motion left off.[1] At the end of its GR 12(n) statement Intercargo also filed a two-paragraph statement of additional assertedly uncontested material facts, cited here as "D. 12(n) Add. ¶ —."

Finally, this Court has followed its regular procedure in dealing with cross-motions under Rule 56: Each party filed a memorandum in support of his or its motion, then a response to the other party's opening memorandum. Accordingly this opinion will cite those memoranda by following "P.Mem." or "D.Mem." with a roman numeral "I" or "II," followed by the page number.

### Facts

Austrian citizen Perzy is in the business of manufacturing and selling Schneekugeln—"snowball" paperweights consisting of a clear globe containing a miniature scene, filled with water and a particulate that, when shaken, looks like falling snow (D. 12(m) ¶ 1, Perzy Aff. ¶ 1). In October 1990 Perzy shipped 20 pallets of Schneekugeln to Marijan Wregg ("Wregg") of Wregg Imports in Tustin, California (D. 12(m) ¶ 19). Because many of the Schneekugeln had plastic bases rather than the wooden bases Wregg had ordered, Perzy agreed to Wregg's request to be allowed to return them if he could not sell them during the Christmas season (D. 12(m) ¶ 21, Perzy Aff. ¶ 2). Wregg sold fewer than half of the Schneekugeln, and in February 1991 he asked Kathleen Tansey–Riggs ("Tansey–Riggs"), who does business as a customs broker freight forwarder under the name "Tansey & Riggs," to arrange for shipment and insurance of the Schneekugeln (D. 12(m) ¶ 5, Wregg Aff. ¶ 2).

---

1. Again in the interests of simplicity, in each instance where either party's GR 12(n) response admits the opposing party's corresponding GR 12(m) statement, this opinion will simply cite the statement as "P. 12(m) ¶ —" or "D. 12(m) ¶ —," without adding the corresponding citation to "D. 12(n)" or "P. 12(n)."

Perzy received from Tansey–Riggs a "Certificate of Marine Insurance" (the "Certificate") stating that it covered the cargo against "ALL RISKS INCLUDING WAR AND BREAKAGE" (P. 12(m) ¶ 40, D.Ex. 4). Tansey Riggs insured the cargo for $27,839 and charged and collected a $217.14 premium from Wregg (Wregg Aff. ¶ 5). In doing so Tansey–Riggs mistakenly calculated the insured value based on the invoice price for the 20 pallets originally sent from Austria in November, rather than the 13 pallets being returned to Austria (D. 12(m) ¶ 28, Tansey–Riggs Dep. 96, 136).

When the Schneekugeln arrived in Vienna they were in a "frozen and damaged condition" (D. 12(m) ¶ 31).[2] Perzy communicated with Tansey–Riggs and Intercargo's European representative Gellatly Hankey Marine Services GmbH ("Gellatly Hankey") to advise them of the loss (P. 12(m) ¶ 6). Arrangements were made for a Lloyd's representative to act for Intercargo as an insurance surveyor to examine the shipment. After examination the surveyor characterized the shipment as "a total loss" (D.Ex. 12, Spear Aff.Ex. 1 at 4).[3] On August 5, 1991 Intercargo formally responded to Perzy's claim by denying it (P.Mem. I–6 and its Ex. 2).

Perzy now seeks summary judgment on both his claims: breach of insurance agreement and vexatious refusal to pay. Intercargo's cross-motion attacks the latter claim both on the merits and in terms of the reasonableness of Intercargo's denial of Perzy's claim of loss, while its attack on the breach of contract claim asserts (D.Mem. I–1):

2. During the week between March 22, 1991 (when the ship carrying the Schneekugeln arrived in Munich) and March 28 (when the truck to which they had been transferred for overland transport—in the same shipping containers—arrived in Vienna), temperatures in much of Europe were at near-record lows due to a freak cold wave from Siberia.

3. Perzy and Intercargo disagree as to whether the Lloyd's surveyor determined that all of the damage to the Schneekugeln was due to freezing or whether some was due to their being crushed (P. 12(m), D. 12(n) ¶ 43). Under the heading "Description of loss/damage" the survey report said "Damage due to freezing," listing the cause as "Low outside temperature during transit" (D.Ex. 12, Spear Aff.Ex. 1 at 2). But the surveyor also noted that "5 cartons [were] damaged"

(a) Coverage is excluded for inherent vice, as provided in the insurance policy and certificate;

(b) Coverage is excluded for improper packaging as provided in the insurance policy and certificate; and

(c) Coverage is excluded because Perzy is making an exaggerated claim in violation of policy terms and has breached his duty that he owes to his insurer under the admiralty doctrine in *uberrimae fidei.*

### Applicable Law

■ As stated at the outset of this opinion, this action has invoked the court's admiralty jurisdiction. Under that jurisdiction the marine insurance policy is normally construed—absent any rule of established federal admiralty law—in accordance with state insurance law (*Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 316–21, 75 S.Ct. 368, 371–74, 99 L.Ed. 337 (1955)). In this instance the open cargo policy under which Tansey–Riggs issued the insurance Certificate (the "Policy") included a clause providing that "all terms and conditions of this insurance shall be governed by Illinois law" (D.Ex. 3 at 3b). And Perzy's Certificate stated (D.Ex. 4 at 1):

This certificate is issued subject to the standard International Cargo & Surety Insurance Company open cargo policy, which is incorporated herein by reference. To the extent that any terms or conditions in this certificate are inconsistent with the standard policy, the standard policy shall

(*id.* at 1), and it is unclear whether that was due to water leakage or crushing. In his narrative report the surveyor stated (*id.* at 4), "Upon arrival, during unloading, it was established that the snowballs were partially frozen and some of them crushed" and went on to say (*id.*), "As low outside temperature had caused the water inside the snowballs to freeze, either the pedestals of the snowballs were expanded or the snowballs burst due to increasing volume of the water inside" (*id.*). Perzy seems right in urging that "crushed" would be an odd way to describe the effect of an expansion or bursting—both of those terms really reflect pressure outward rather than inward. But as it turns out, it is not germane to this dispute whether the snowballs were crushed or broken.

govern the rights and duties of all parties subject to the contract of insurance.

■ Although the parties' memoranda did not specifically address the choice of law issue,[4] they did address the question whether the terms of the Policy applied to Perzy's insurance coverage. Perzy argues that the Policy terms are not applicable because it was never sent to him (P.Mem. I–9, citing *Western Casualty & Surety Co. v. Harris Petroleum Co.*, 220 F.Supp. 952, 956 (S.D.Cal.1963) and *Hartford Accident & Indem. Co. v. Shaw*, 273 F.2d 133, 138 (8th Cir.1959)). Those cases, however, involve endorsements missing from what is otherwise a self-contained policy of insurance (see *Georgetown Assoc. v. Cherokee Ins. Co.*, 535 F.Supp. 912, 913–14 (N.D.Ill.1982)). By contrast a certificate of insurance is by definition not self-contained. Instead the certificate and the master policy upon which it is issued together constitute the contract of insurance (*J.M. Corbett Co. v. Insurance Co. of N. Am.*, 43 Ill.App.3d 624, 626, 2 Ill.Dec. 148, 150, 357 N.E.2d 125, 127 (1st Dist.1976)). Thus an insured who receives a certificate of insurance should expect that terms affecting the scope of coverage are contained in a separate master policy (13A John Appleman and Jean Appleman, *Insurance Law & Practice* ["Appleman"] § 7530 (1976 and 1992 pocket part)).

■ Where as here the parties have included a choice of law clause in a maritime contract, the law of the chosen jurisdiction will be applied unless (1) that jurisdiction has no substantial relationship to the parties or the transaction or (2) that jurisdiction's law conflicts with the fundamental purposes of maritime law (*Stoot v. Fluor Drilling Serv., Inc.*, 851 F.2d 1514, 1517 (5th Cir.1988); *King v. Allstate Ins. Co.*, 906 F.2d 1537, 1540 (11th Cir.1990)). Hence Illinois law will provide the rules of decision as to the interpretation of coverage under the Policy in this case.

### Inherent Vice

■ Intercargo argues that coverage for damage to the Schneekugeln due to freezing

is excluded under the "inherent vice" exception included in both the Certificate and the Policy (D.Mem. I–5, D.Ex. 3 at 2, D.Ex. ¶ 11.VI and page 3b). Intercargo insists that the freezing was a result of the "inherent nature" of the Schneekugeln and that the freezing was "inevitable" (D.Mem. I–6).

Inherent vice is "a quality of the goods that causes damage to the goods during transport even in the absence of negligence" (*Mulay Plastics, Inc. v. Grand Trunk W. R.R.*, 822 F.2d 676, 683 (7th Cir.1987)). Properties with an inherent vice "carry within themselves the seeds of their own destruction" (*Essex House v. St. Paul Fire & Marine Ins. Co.*, 404 F.Supp. 978, 991 (S.D.Ohio 1975)). "Foods rot; iron rusts; some wines simply do not travel well" (*Mulay Plastics*, 822 F.2d at 683); see also *Employers Casualty Co. v. Holm*, 393 S.W.2d 363, 367 (Tex. Civ.App.1965) ("The term 'inherent vice' as a cause of loss not covered by the policy, does not relate to an extraneous cause but to a loss entirely from internal decomposition or some quality which brings about its own injury or destruction"). Loss from inherent vice must be "inevitable, certain and nonfortuitous," even if the timing of the loss may not be calculable (Andrew Hecker, Jr. and M. Jane Goode, *Wear and Tear, Inherent Vice, Deterioration, Etc.: The Multi–Faceted All–Risk Exclusions*, 21 Tort & Ins.L.J. 634, 640 (1986)). As *Mellon v. Federal Ins. Co.* 14 F.2d 997, 1002 (S.D.N.Y.1926) explained:

> It must always be borne in mind that the policies are of *insurance* and not of warranty of soundness.... The words "other causes of whatsoever nature" cover, in my opinion, "all risks"; but the perils insured against are *risks*.

Quoting Lord Sumner in *British & Foreign Marine Co. v. Gaunt*, 2 App.Cas. 41, 57 (1921), *Mellon, id.* continued:

> The expression ["all risks"] does not cover inherent vice or mere wear and tear.... It covers a risk, not a certainty; it is something which happens to the subject-matter from without, not the natural be-

---

**4.** Intercargo cites Illinois law throughout its papers, while Perzy cites admiralty cases from various jurisdictions.

havior of that subject-matter, being what it is, in the circumstances under which it is carried.

Intercargo's argument really blurs the distinction between true inevitability—something that is bound to occur even in the absence of external forces ("food rots")—or something that is bound to occur because the external forces are always present ("iron rusts") and, by contrast, a quality that makes property vulnerable to damage only *if* a non-inevitable external force is in fact encountered. Freezing and destruction of the Schneekugeln scarcely seem to be a matter of uninsurable certainty. Left to themselves on a shelf or on someone's desktop, Schneekugeln will not freeze and break. In those terms it is a strain on the English language to speak of freezing as the "consummation of an indwelling fault" (*Essex House,* 404 F.Supp. at 991).

Intercargo contends that freezing was inevitable, "rather than [ ] resulting from a fortuitous circumstance, particularly as this shipment was made in winter on a sojourn that lasted from February 18, 1991 · . . . to March 28, 1991" (D.Mem. I–6 to –7). But once again, inevitable events are those that "are not a risk but a certainty" and in that sense are uninsurable (*Essex House,* 404 F.Supp. at 988). By contrast, 3 Restatement (Second) of Contracts § 379 comment a (1979) describes a fortuitous event as:

> an event that, so far as the parties to the contract are aware, is dependent on chance. Its occurrence may be within the control of third persons or beyond the control of any person.

Intercargo has chosen to ignore (among other things) the uncontroverted evidence about the freak cold snap to which the Schneekugeln were subjected during the last leg of their journey (the overland truck travel in Europe). When Perzy's customer made the arrangements for the Schneekugeln to be returned, the original truck bill of lading was expressly legended "SENSITIVE TO FREEZING" (a legend also present on the Schneekugeln's cartons themselves). Thus even if the occurrence of freezing temperatures while the goods were in transit had been likely—something that the record does *not* establish—any resulting damage would still have been dependent on the failure of the carriers to take appropriate precautions (such as packing the Schneekugeln in a temperature-controlled container). On the facts of this record, then, it would surely appear that freezing was a "risk" dependent on the occurrence of other events, rather than a "certainty."

But this Court need not decide whether the presence of the water in the Schneekugeln at the time of shipment can properly be termed an "inherent vice," because Policy ¶ 11.VI (D.Ex. 3 at 2) also specifies that a disqualifying inherent vice must be the proximate cause of the loss. Thus the fact that other factors had to occur as a precondition to freezing and resulting damage comes into play in another way. Both Perzy and Intercargo agree that methods could readily have been employed to protect the Schneekugeln from freezing (D. 12(m) ¶ 36).[5]

*Lanasa Fruit S.S. & Importing Co: v. Universal Ins. Co.,* 302 U.S. 556, 562, 58

---

**5.** Perzy does not agree with Intercargo that the *only* way to keep the Schneekugeln from freezing was stowage in a temperature-controlled container, which required specific booking and additional shipping costs. His P. 12(n) ¶ 36 does say, "Obviously, a shipment can be kept out of the cold." But in terms of the method of stowage, Perzy suggests negligence on the part of the consolidator in failing to see that the Schneekugeln were placed in a proper container (P.Mem. II–2). On that score Intercargo's expert Spear testified that the consolidator (Spear Dep. 38–40):

> [s]hould have notified the shipper that there was inadequate protection ... I think they have a duty to represent their client and protect the cargo that's given under their care,

and in so doing should have notified the shipper or actually refused to move the freight forward.

Relatedly P.Mem. II–2 suggests the consolidator's negligence in failing to carry over the "SENSITIVE TO FREEZING" warning to the ocean bill of lading. For its part Intercargo urges (D.Mem. I–10) that the proper marking absent a heated container should have been the international symbol for freezing, a penguin in a rectangle with a slash through it, and the words "Do not Freeze" underneath (D.Ex. 12, Spear Aff.Ex. 2). Of course such arguments as to the presence of negligence, and on whose part, are not susceptible to resolution via summary judgment. Most importantly, they are not material to the outcome of the issues now under review.

S.Ct. 371, 374, 82 L.Ed. 422 (1938) makes clear that even in marine insurance cases, where the doctrine of proximate cause is strictly applied, "the proximate cause is the efficient cause and not a merely incidental cause which may be nearer in time to the result." In *Lanasa* a shipment of bananas spoiled when a ship was delayed. When shipped the bananas were sound, and they would have been merchantable upon delivery if not for the delay (*id.* at 559, 58 S.Ct. at 372). Rejecting the insurer's argument that the loss was due to inherent vice, the Court held that the stranding was the proximate cause of the loss and that the loss was covered under the policy's perils of the sea clause (*id.* at 562, 572).

Just so, even if the Schneekugeln's potential vulnerability to freezing were characterized as an inherent vice (a dubious assumption at best, as already explained), still with proper care their freezing could have been avoided. Intercargo has asserted that freezing, especially at that time of year, was extremely likely. But even accepting that contention, the efficient cause of the Schneekugeln's freezing was the failure of some actor responsible for proper stowage to containerize or otherwise protect them. Hence the Policy's exclusion for inherent vice does not apply.

### Improper Packaging

Next Intercargo contends that coverage under the Policy is excluded because the Schneekugeln were improperly packed (D.Mem. I–7, D.Ex. 3 at 3b, D.Ex. 4 at 2). With regard to packaging, the Policy provides (D.Ex. 3 at 3b):

*IMPROPER PACKAGING*

In no case shall this insurance cover loss damage or expense caused by insufficiency or unsuitability of packing or preparation of the subject matter insured.

But that sentence (quoted and sought to be relied on by Intercargo) goes on to limit sharply the extent to which *containerization* is excluded from Policy coverage:

(For the purpose of this clause "packing" shall be deemed to included [sic] stowage in a container or liftvan but only when such stowage is carried out prior to attach-

ment of this insurance or by the assured or their servants).

In their original packaging the Schneekugeln were packed in cardboard boxes stuffed with styrofoam (D. 12(m) ¶ 34). This opinion has already referred to the "SENSITIVE TO FREEZING" warning on those cartons and on the truck bill of lading (P. 12(m) ¶ 51). And reference has also been made to the Intercargo contention that the packages should have been marked with the international symbol for sensitivity to freezing.

That contention, however, is not the sum total of Intercargo's argument as to packaging. It also asserts that the international marking would not have satisfied Perzy's duties. It points to Alan Spear Aff. ¶ 7 as establishing that the only way to protect the Schneekugeln from freezing would have been to place them in a refrigerated or temperature-controlled container (D.Mem. I–9 to – 10).

■ Before this opinion turns to the issue of containerization, it should be made plain that no other challenge to coverage can be launched under the Policy's improper packaging exclusion. In that respect Perzy argues that the exclusion cannot apply to *his* packaging of the goods because Intercargo's agents admitted that the packaging itself was proper and customary. Even though on analysis only one of the two asserted admissions can be placed at Intercargo's door, that one suffices to defeat any claimed defense of that type.

First as to the binding admission: Intercargo's German representative Gellatly Hankey sent the Lloyd's surveyor to inspect the Schneekugeln on April 4, 1991. In his survey report, the Lloyd's surveyor wrote "Yes" in answer to the question "Was packing customary?" Immediately below that question the survey report form stated, "If in the surveyors [sic] opinion the packing was not adequate for this transit, give full explanation under Further remarks" (D.Ex. 12, Spear Aff.Ex. 1 at 2). And the surveyor wrote nothing at all in the "Further remarks" section of the report (*id.* at 3). Perzy correctly contends that the surveyor's admission binds

Intercargo and prevents it from asserting the improper packaging exclusion.

Under Illinois law an agent may make an admission that is binding on the principal, if the statement pertains to matter within the scope of the agent's authority and is made in the exercise of his or her duties (*Werner v. Botti, Marinaccio & DeSalvo*, 205 Ill.App.3d 673, 679, 151 Ill.Dec. 41, 46, 563 N.E.2d 1147, 1152 (5th Dist.1990); *Miller v. J.M. Jones Co.*, 225 Ill.App.3d 799, 803, 167 Ill.Dec. 385, 389, 587 N.E.2d 654, 658 (4th Dist.1992)). Here the Lloyd's surveyor was unquestionably Intercargo's agent. Policy ¶ 33 states:

> Any loss or damage to the property hereby insured must be promptly reported to the Assurer or to the nearest Agent of the Assurer and such Agent must be represented on all surveys and must approve proofs of loss and bills of expense. If there be no such Agent at or near the port or place where the loss is discovered or the expenses incurred, then such report must be made to the nearest representative of the American Institute of Marine Underwriters or to Lloyds Agent, and his approval obtained as above. Failure to report loss or damage promptly and to file such proof of loss shall invalidate any claim under this policy.

It was in accordance with that provision that Intercargo's Austrian representative Gellatly Hankey sent the Lloyd's agent to prepare a survey report on the damaged Schneekugeln (D. 12(m) ¶ 43). Indeed, even in the absence of such an express agency any agent of another insurance company who prepares an adjuster's report "is such an agent of defendant as to render his declarations admissible against it" (16C Appleman § 9375, at 619 & nn. 23–24, citing *Mattson v. Connecticut Fire Ins. Co.*, 80 F.Supp. 101, 105 (D.C.Minn.1948) and *Stockton Combined Harvester & Agric. Works v. Glens Falls Ins. Co.*, 121 Cal. 167, 53 P. 565 (1898)). Under the facts of this case Intercargo is bound by its own agent's express admission and is precluded from advancing the defense of improper packaging in the face of it.

■ That alone dooms this facet of Intercargo's defense, but Perzy's added contention in this area should be discussed in the interest of completeness. Perzy also points to a statement by Tansey–Riggs and urges that she too was an agent of Intercargo. Tansey–Riggs wrote this in an October 1, 1991 letter to Intercargo (D.Ex. 10):

> This merchandise is appropriately packed. I've seen it when they open the pallbox. It is packed to prevent breakage. As the shipment did not freeze in October 1990, it is reasonable to assume it would not freeze on the return trip. In fact, freezing was never in question by us. There is only so much a supplier, or exporter can do to pack merchandise appropriately. I can assure you that those reasonable steps were taken.

Intercargo responds by insisting that Tansey–Riggs was Perzy's agent and not Intercargo's, so that her statement as to packaging was not binding on Intercargo (D.Mem. I–7 to –8, D.Mem. II–7 to –8).

Neither side has it exactly right. Although Tansey–Riggs was a freight forwarder rather than an insurance broker by profession, in the relationship between Perzy and Intercargo she functioned as an insurance broker, "an individual who procures insurance and acts as middleman between the insured and the insurer" (*Krause v. Pekin Life Ins. Co.*, 194 Ill.App.3d 798, 804, 141 Ill.Dec. 402, 406, 551 N.E.2d 395, 399 (1st Dist.1990)). In examining agency relationships Illinois law focuses on the agent's conduct rather than on his or her title (*id.; Zannini v. Reliance Ins. Co.*, 147 Ill.2d 437, 452–53, 168 Ill.Dec. 820, 826–27, 590 N.E.2d 457, 463–64 (1992)) and recognizes that under certain circumstances an independent insurance agent may be an agent of both the insured and the insurer (*A & B Freight Line, Inc. v. Ryan*, 216 Ill.App.3d 1093, 1097, 159 Ill.Dec. 894, 897, 576 N.E.2d 563, 566 (2d Dist.1991)).

Whether such an independent insurance agent was acting as the agent of the insured or insurer typically depends on a four-factor analysis: (1) who first set the agent in motion, (2) who could control the agent's action, (3) who paid the agent and (4) whose interest the agent was attempting to protect (*Krause*, 194 Ill.App.3d at 805, 141 Ill.Dec. at 406, 551 N.E.2d at 399). Examination of those fac-

tors in the context of the specific transaction at issue defines the relationship, except to the extent that the individual acts pursuant to express authority granted in an agency agreement (*Zannini*, 147 Ill.2d at 452–53, 168 Ill.Dec. at 826–27, 590 N.E.2d at 463–64).

Although the matrix of factors here indicates that Tansey–Riggs acted as Intercargo's agent in the original placement of the insurance coverage, she clearly was not acting in that capacity when she later wrote the October 1 letter about Perzy's claim. Intercargo did not spur her to write the letter, it did not control what she wrote, it certainly did not pay her to do so and she was not acting in its interest when she wrote the letter. From the text of the letter, it appears that it was her response to Intercargo's rejection of the claim, in which she took up the cudgels on Perzy's behalf by refuting Intercargo's objections point by point. At least with reasonable pro-Intercargo inferences (the proper perspective on Perzy's Rule 56 motion), Tansey–Riggs could be viewed as Perzy's agent in writing the letter. That being so, Tansey–Riggs' statement in the letter that the packaging of the Schneekugeln was proper was not binding on Intercargo.

 As said earlier, though, the admission by the Lloyd's surveyor—as Intercargo's agent—is enough to torpedo its improper packaging defense except to the extent that "packaging" might be read as covering containerization as well. And in that respect there is an even more fundamental reason that defeats Intercargo, although surprisingly Perzy does not refer to it (and Intercargo studiously avoids it): the language of the Policy exclusion itself. Intercargo selectively quotes only the first portion of the exclusion listed as "Improper Packaging" and quoted at the outset of this section (D.Ex. 3 at 3b).[6]

But Intercargo wholly omits the critical parenthetical limitation, also quoted at the outset of this section, that concludes (and is thus part of) that very same sentence.[7]

Both parties agree that the problem in packaging the Schneekugeln rested with the shipping container that they were stowed in, rather than with the material packed around the Schneekugeln in their individual boxes. As already discussed at some length, Intercargo repeatedly states in its moving papers that the only way in which the Schneekugeln could have been protected from freezing would have been to pack them in a temperature-controlled container (D. 12(m) ¶ 36, D.Mem. I–9 to –10). Perzy Mem. II–9 similarly cites Speak's Aff. ¶ 7 (D.Ex. 12) stating that "In order to be protected against freezing, this shipment should have been placed in a temperature-controlled container whose temperature was kept above the freezing level." Spear also stated at his Dep. 29:

> [I]n this case I'm talking about packaging in a much bigger concept than just the box, they were not properly prepared for shipment in cold temperatures.

> \* \* \* \* \* \*

> Packaging as such generally means the protection provided around the particular object or around the set of objects as in the cartons in this case. The issue here is that the environment in which they were shipped was not proper.

Under the express language of the Policy, then, any exclusion for improper packaging would apply only if the boxes of Schneekugeln had been stowed in a larger container before attachment of the insurance (which was clearly not the case) or if Perzy or his servants had stowed the Schneekugeln in the larger container.

---

**6.** It will be noted that the Policy used "packaging" and "packing" synonymously in defining the exclusion. And it will be recalled that the surveyor's report (a standard form of Survey Report (Goods) for use by Lloyd's agents) referred to "interior and exterior packing," described by the surveyor as "Cardboard boxes, with inner cartons excess space filled with styrofoam" (D.Ex. 12, Spear Aff.Ex. 1 at 2). Clearly the Lloyd's agent was not referring to the ocean

container into which the cardboard boxes were placed.

**7.** [Footnote by this Court] That misleading omission by Intercargo is reminiscent of the practice of some motion picture advertisements—quoting just enough of the movie reviewer's language (with or without ellipses) to convert a lukewarm (or even unfavorable) appraisal into a seeming rave review.

As for the latter alternative, although (as already pointed out) neither Intercargo nor Perzy addressed the provision directly, Wregg's description in his Aff. ¶ 7 indicates that the goods were out of his and Tansey–Riggs' control by the time they were packed in a container. Wregg stated that it was his duty to note warnings such as "SENSITIVE TO FREEZING" on the truck bill of lading. Then a freight consolidator became responsible for carrying such warnings over to the ocean bill of lading, which was prepared before the boxes were loaded into an ocean container (Wregg Aff. ¶ 7). Both Wregg and Tansey–Riggs testified that Tansey–Riggs arranged for the boxes of Schneekugeln to be picked up from Wregg (D.Ex. 2, Wregg Dep. 40; D.Ex. 1, Tansey–Riggs Dep. 32).

As already stated under "Rule 56 Standards," Intercargo has the burden of proof as to the applicability of the Policy's exclusion of coverage for improper packaging. For Rule 56 purposes that means the lesser burden of demonstrating a material issue of fact in that respect. But Intercargo has not advanced anything to create the reasonable inference that containerization of the Schneekugeln was carried out by Perzy or his servants, and so Intercargo has failed to meet even that lesser burden. Hence the Policy's exclusion for improper packaging does not apply.

*Perzy's Assertedly Exaggerated Claim*

Intercargo next argues that coverage under the Policy is precluded because the Schneekugeln were insured for an amount in excess of that permitted by the Policy. Wregg requested that Tansey–Riggs insure the shipment for the invoice value of the 13 pallets of Schneekugeln being returned, plus an additional 40% for shipping and incidental expenses (D. 12(m) ¶¶ 27, 28, Wregg Dep. 41). However, Tansey–Riggs mistakenly insured the shipment for the invoice value of the original 20 pallets plus 40%. Intercargo

contends that such an overvaluation voids the Policy ab initio for two reasons: Tansey–Riggs breached her contract with Intercargo to issue certificates strictly in accordance with the terms of the Policy, and issuance of the overvalued Certificate here constituted a breach of the doctrine of *uberrimae fidei*.

Policy ¶ 7 provides:

Value at the amount of invoice, including all charges therein, and including prepaid and/or advanced and/or guaranteed freight if any, plus 10% or at amount declared prior to shipment and prior to any known or reported loss or accident. Foreign currency to be converted into U.S. dollars at the rate of exchange current in New York.

Policy ¶ 38 defines the authority of the assured (nominally Tansey–Riggs) to issue certificates of insurance:

Privilege is hereby granted the Assured to countersign the Assurer's certificates or policies of insurance for any and all risks covered hereunder, it being agreed, however, that such certificates or policies will be issued strictly in accordance with the terms and conditions of this policy.

Intercargo's first argument is that Tansey–Riggs' insuring the shipment for an extra 40% was a deliberate overvaluation and a clear material breach of that last-quoted provision. Hence, Intercargo says, the insurance contract is not binding on Intercargo. But that contention—when advanced as a matter of law—fails for two reasons.

In the first place, Intercargo simply has not shown that, apart from Tansey–Riggs' mistake in valuing the shipment based on the 20 pallets that were sent from Austria rather than the 13 that were being returned,[8] the additional 40% above invoice coverage was more than the amount that was permissibly included in "all charges therein, and including prepaid and/or advanced and/or

---

**8.** On that score Tansey–Riggs' mistaken calculation is of the kind that equity would correct through reformation of the contract (*Magnus v. Barrett*, 197 Ill.App.3d 931, 934–35, 145 Ill.Dec. 482, 485, 557 N.E.2d 252, 255 (1st Dist.1990); *Hanes v. Roosevelt Nat. Life Ins. Co. of America*, 116 Ill.App.3d 411, 415, 72 Ill.Dec. 232, 235, 452 N.E.2d 357, 360 (5th Dist.1983)). Both Perzy and Tansey–Riggs intended that the amount of

the insurance would be calculated based on the 13 pallboxes being returned to Austria, not the 20 that were originally sent to California (D. 12(m) ¶ 27). In this area Perzy has gotten greedy by attempting to avoid such a reduction in the claim, but his Mem. I–4 is simply wrong in classifying Tansey–Riggs' error as a unilateral mistake that would preclude operation of the doctrine of reformation.

guaranteed freight if any, plus 10%." That is not, however, to say that Perzy wins on this issue either. According to his P.Mem. II–11, "all charges therein" amounted to $4,704.15, so that the shipment could have been insured for as much as $29,167.07. But like many a schoolchild, Perzy has failed to show his work on this math problem, and it is difficult to determine how he reached either figure.

From this Court's own review of the figures it appears that eastbound ocean/land freight came to $1,866.02, Tansey–Riggs charged $460.50 and the insurance premium was $217.14 (Perzy Aff. ¶ 9). Converted to United States dollars, the value of the 13 pallets sent back to Austria amounted to $16,129.47 (D. 12(m) ¶¶ 29, 30). All those figures added together, plus 10%, amount to $20,540.44,[9] while 40% above the invoice of $16,129.47 comes to $22,581.26. But that may not be the right comparison—without more information about "all charges" permissibly included in the base figure, a question of fact would remain as to whether the 40%–above–invoice calculation resulted in an overvaluation on the 110% formula.

But there is an independent second alternative—one not addressed by the parties—that is contained in Policy ¶ 7: the provision permitting insurance coverage for "Value ... at amount declared prior to shipment and prior to any known or reported loss or accident." On its face that language expressly permits valuation at any amount that the shipper declares as long as it is done before shipment and before any loss or accident. Even if Intercargo would argue that the language is ambiguous or does not allow

for such discretion in valuation, under Illinois law any such ambiguity or uncertainty is liberally construed in favor of Perzy and in favor of coverage (*Bituminous Casualty Corp. v. Gust K. Newberg Constr. Co.*, 218 Ill.App.3d 956, 960, 161 Ill.Dec. 357, 359, 578 N.E.2d 1003, 1005 (1st Dist.1991); see also *FDIC v. American Casualty Co.*, 998 F.2d 404, 407–08 (7th Cir.1993)). Intercargo's contention that the policy is void for violation of the valuation provision must fail.[10]

As already stated, Intercargo's second argument in this area is that Tansey–Riggs and Perzy have violated the marine doctrine of *uberrimae fidei*, which imposes on parties to a marine contract an obligation of "the highest degree of good faith" (D.Mem. I–12). To that end Intercargo quotes *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir.1986):

> This stringent doctrine requires the assured to disclose to the insurer all known circumstances that materially affect the risk being insured. Since the assured is in the best position to know of any circumstances material to the risk, he must reveal those facts to the underwriter, rather than wait for the underwriter to inquire.

Quite apart from that doctrine, Illinois insurance law (215 ILCS 5/154) specifies that no misrepresentation in an insurance policy or endorsement or application shall defeat or avoid the policy "unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company."

---

9. Perzy's affidavit also sought to include several other items in the base figure: shipping, insurance, customs and duties and trucking charges incurred in shipping the goods to Wregg in October. But those items were sunk costs, not to be recovered through return of the goods to Perzy, and hence could not properly be included in a calculation of Perzy's losses or in a valuation of the goods for insurance purposes.

10. This Court is of course aware of the hazards of granting an insured carte blanche in terms of valuation where the insured retains control over the insured property—say in fire insurance on a building, where such a provision would extend

an open invitation to a profitable arson. But in this instance the insured contingency covered the property while in the possession of unrelated third parties, essentially eliminating the risk of such a deliberate overinsuring with malice aforethought. Moreover, any such objection by Intercargo (really a public policy argument) would not begin to explain why the alternative valuation provision, inserted by Intercargo itself, should not be read as it is written—or what other plausible reading would explain why the alternative was put there to begin with. And such public policy arguments must be very sparingly employed to deny the enforcement of contract terms in any event (see *American Casualty Co.*, 998 F.2d at 409–10).

This Court need not consider, as was done in *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 888–89 (5th Cir.1991), whether *uberrimae fidei* is a viable doctrine and whether it conflicts with and should override state law in a situation such as this. After all, Perzy surely did not fail to disclose any information to Tansey–Riggs: Instead Wregg specifically asked that Tansey–Riggs insure the cargo for invoice plus 40%.

Intercargo seeks to characterize Tansey–Riggs as Perzy's agent, and thus to charge Tansey–Riggs with failure to disclose the 40%–above–invoice valuation to Intercargo. But it is beyond dispute that even if Tansey–Riggs may also have been serving as Perzy's agent when she purchased insurance, in all events she was surely *Intercargo's* agent in that respect. Before Perzy ever entered the picture Intercargo had given Tansey–Riggs the authority to write insurance policies with Intercargo as insurer (thus "setting Riggs in motion" in the sense of· *Krause*, 194 Ill. App.3d at 805, 141 Ill.Dec. at 406, 551 N.E.2d at 399 and like authority). And it is also uncontroverted that Intercargo controlled Tansey–Riggs' actions through the terms of the Policy, that it paid her commissions and that she was working in Intercargo's behalf in writing certificates for it and in collecting premiums (see *A & B Freight Line*, 216 Ill.App.3d at 1097, 159 Ill.Dec. at 898, 576 N.E.2d at 567). All that being true, any knowledge that Tansey–Riggs had in preparing the Certificate is imputed to her principal Intercargo, as long as Perzy did not act in bad faith (and Intercargo has not suggested that he did) (*Marionjoy Rehabilitation Hosp. v. Lo*, 180 Ill.App.3d 49, 53, 129 Ill. Dec. 296, 299, 535 N.E.2d 1061, 1064 (2d Dist.1989)). *Uberrimae fidei* does not void the Policy.

Intercargo has thus failed to create any genuine issue of material fact as to the applicability of any exclusion or other grounds for avoidance of the Policy. Under *Celotex*

*Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552 that calls for the entry of summary judgment in Perzy's favor as to Intercargo's breach of the parties' contract of insurance coverage.

## Attorney's Fees for Vexatious Refusal to Pay

Perzy argues that attorneys' fees are warranted under 215 ILCS 5/155(1) because (1) Intercargo relied on exemptions not included in the Certificate given to Perzy by Tansey–Riggs and (2) Intercargo attempted to change the scope of coverage after Perzy filed his claim.[11] That statute provides:

In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b) $25,000;

(c) the·excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

Mere refusal by an insurer to pay a claim does not of course call that cited provision into play. Illinois case law has elaborated on ·the statutory terms "vexatious and unreasonable" by referring to "outrageous conduct" (*Emerson v. American Bankers Ins. Co.*, 223 Ill.App.3d 929, 936, 166 Ill.Dec. 293, 299, 585

---

11. Perzy's Mem. I–6 objected to a change in coverage purported to have been effected by an "Invoice Change Form" (P.Mem. I Ex. 1) issued August 1, 1991 by Intercargo Vice President Lee Thorson ("Thorson"). Under the mistaken notion that the Schneekugeln were used goods, Thorson attempted to alter coverage under the Policy after Perzy's claim was filed (D.Mem. II

Ex. 3, Thorson Dep. 45). Thorson acknowledged during his deposition that he was wrong to have tried to make such a unilateral change in coverage (D.Mem. II Ex. 3, Thorson Dep. 45), and Intercargo has not sought to persuade this Court that the purportedly revised Policy takes precedence over the Certificate issued February 18, 1991.

N.E.2d 1315, 1321 (5th Dist.1992)) and by giving such examples as (*id.* at 936, 166 Ill.Dec. at 298–99, 585 N.E.2d at 1320–21):

> failure to adequately investigate a claim or denial of the claim without adequate supporting evidence; failure to evaluate a claim objectively; interpreting policy provisions in an unreasonable manner; unreasonably low settlement offers; reliance on misrepresentations in the insurance application which are very minor, or where the insurer's agent knowingly filled out the application falsely; and abusive or coercive practices designed to compel compromise of a claim.

As for Perzy's assertion based on Intercargo's denial of the claim because of exclusions listed in the Policy but not in the Certificate, this opinion has already said that the Policy was expressly incorporated by reference in the Certificate and that the holder of a certificate of insurance is on notice of a master policy which defines the scope of coverage. Even though Intercargo has not prevailed in asserting the applicability of the Policy's exclusions, Perzy has made no showing that Intercargo asserted those defenses in anything other than a bona fide dispute about coverage (*Butler v. Economy Fire & Casualty Co.*, 199 Ill.App.3d 1015, 1024, 146 Ill.Dec. 94, 100, 557 N.E.2d 1281, 1287 (2d Dist. 1990)).

That effectively moots Perzy's other argument based on Thorson's attempted August 1, 1991 change in the scope of coverage, some five months after Perzy's claim was filed. Four days later Thorson sent Perzy a letter explaining that coverage was denied (1) in part because the goods were "used"—thus barring coverage under that recent purported change in the Policy—and also (2) because loss was inevitable due to failure to protect the goods from freezing. It is true that Thorson and Intercargo have admitted that he was mistaken in attempting to change the coverage based on the notion that the goods were used (D.Mem. 2 Ex. 3, Thorson Dep. 45, D. 12(n) Add. ¶ 2). But Intercargo had separate good faith grounds for denying the claim, and Perzy has not shown that the simultaneous denial of the claim based on the erroneous change in the scope of coverage (however unpardonable that unilateral action may have been) caused any additional delay or hardship.

It must be said that Intercargo's conduct in that regard has not commended itself to this Court. But that does not trigger fee-shifting under Illinois law, and Perzy's request for attorney fees under 215 ILCS 5/155(1) is denied.

### *Conclusion*

Intercargo has not shown that any exclusion in the all-risks Policy covering the Schneekugeln applies or that any material misrepresentations were made such as to avoid the Policy. Therefore its motion for summary judgment of nonliability under the Policy is denied. Because it has also failed to show that—even with all reasonable inferences in its favor—there is a genuine issue of material fact on either of those issues, Perzy is entitled to a judgment as to Intercargo's liability as a matter of law. However, because Intercargo's denial of Policy coverage was based in part on a good faith argument as to an applicable exclusion, Perzy's motion for summary judgment as to an award of attorneys' fees under 215 ILCS 5/155 is denied.

For the reasons stated in this opinion, the amount of Perzy's recovery under the Policy cannot be set at this time without further submissions from the parties. They are ordered to file submissions in that respect in this Court's chambers on or before July 16, 1993. This action is then set for a next status hearing at 8:45 a.m. July 20, 1993.