266 F.3d 112 (2nd Cir. 2001)
 NEW YORK MARINE & GENERAL INSURANCE COMPANY, PLAINTIFF-APPELLEE-CROSS-APPELLEE-CROSS-APPELLANT,
v.
TRADELINE (L.L.C.), DEFENDANT-APPELLEE-CROSS-APPELLANT-CROSS-APPELLEE,
DEEPAK FERTILISERS AND PETROCHEMICALS CORP., LTD., DEFENDANT-APPELLANT-CROSS-APPELLEE.
TRADELINE (L.L.C.), THIRD-PARTY-PLAINTIFF-APPELLEE-CROSS-APPELLANT,
v.
MUTUAL MARINE OFFICE, INC., THIRD-PARTY-DEFENDANT-APPELLEE-CROSS-APPELLEE.
NEW YORK MARINE & GENERAL INSURANCE COMPANY, SECOND-THIRD-PARTY-PLAINTIFF-APPELLEE- CROSS-APPELLANT,
v.
FRENKEL & CO., INC., SECOND-THIRD-PARTY-DEFENDANT-APPELLEE- CROSS-APPELLANT.
 Docket Nos. 00-7825(L), 00-7855(XAP), 00-7903(XAP), 00-7933(XAP)
August Term, 2000
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued: February 21, 2001
Decided September 27, 2001
 
 Appeal and cross-appeals from the judgment of the United States District Court for the Southern District of New York (Harold Baer, Jr., Judge) entered on June 29, 2000, following a bench trial, principally concluding that Plaintiff-Appellee-Cross-Appellee-Cross-Appellant New York Marine & General Insurance Company was partially liable under a marine insurance policy to Defendant-Appellant-Cross-Appellee Deepak Fertilisers and Petrochemicals Corporation, Ltd. for loss sustained to its shipment of diammonium phosphate from Mexico to India.
 AFFIRMED in part, REVERSED and REMANDED in part.[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 John A.V. Nicoletti, Nicoletti, Hornig, Campise & Sweeney, New York, New York, for Defendant-Appellant-Cross-Appellee Deepak Fertilisers and Petrochemicals Corp., Ltd.
 Timothy G. Hourican, Brown Gavalas & Fromm Llp, New York, New York (David H. Fromm, on the brief), for Plaintiff-Appellee-Cross-Appellee-Cross-Appellant New York Marine & General Insurance Company and Third-Party-Defendant-Appellee-Cross-Appellee Mutual Marine Office, Inc.
 Anthony J. Pruzinsky, Hill Rivkins & Hayden Llp, New York, New York, for Defendant-Appellee-Cross-Appellant-Cross-Appellee Tradeline (l.l.c.).
 Barbara A. Sheehan, Peterson & Ross, New York, New York, for Second-Third-Party-Defendant-Appellee-Cross-Appellant Frenkel & Co., Inc.
 Before: Meskill, Parker, and Katzmann, Circuit Judges.
 
 Parker, Circuit Judge
 
 1
 This admiralty case requires us to interpret a marine insurance policy, Open Cargo Policy No. 10490MC594 ("the Policy") issued by Mutual Marine Office, Inc. ("MMO") for New York Marine & General Insurance Company ("New York Marine") and certificates of insurance, Special Marine Policies ("SMPs"), issued under the Policy by Tradeline (L.L.C.) ("Tradeline") to Deepak Fertilisers and Petrochemicals Corp., Ltd. ("Deepak") to cover two shipments of diammonium phosphate ("DAP") aboard the M/V Sea Guardian. Deepak incurred a loss when a cyclone struck the port of Kandla, India, during the discharge of the DAP in early June 1998.
 
 
 2
 Plaintiff New York Marine brought suit, seeking to disclaim liability under the Policy for any of Deepak's loss. On June 29, 2000, the district court awarded Deepak partial recovery. For the reasons set forth below, we affirm in part, and reverse and remand in part.
 
 I. BACKGROUND
 A. The Parties
 
 3
 New York Marine & General Insurance Company is an insurance company that does business in New York through its managing general agent, Mutual Marine Office, Inc. MMO issued to Tradeline the marine insurance policy at issue in this litigation. Tradeline is a United Arab Emirates corporation engaged in the business of supplying and shipping various commodities. Frenkel & Co. ("Frenkel"), an insurance broker with an office in New York, acted as an intermediary for Tradeline in obtaining the insurance policy by negotiating with New York Marine through MMO. Frenkel, however, is not an agent of either New York Marine or MMO.
 
 
 4
 Deepak Fertilisers and Petrochemicals Corp., Ltd. is a corporation organized under the laws of India, engaged in importing fertilizer for sale in the Indian market.
 
 B. The Policy
 
 5
 In May 1994, MMO, on behalf of New York Marine, issued to Tradeline Open Cargo Policy No. 10490MC594, effective May 9, 1994 ("the Policy"). The Policy remained in effect until it was canceled around November 1, 1998, and therefore was in effect during the incidents giving rise to this litigation. The Policy contained 50 typed or manuscripted clauses, several typed endorsements, and several attached pre-printed forms, including the industry standard Institute Cargo Clauses (C) ("ICC(C)"),[1] which were referenced in the typed clauses or endorsements. Tradeline is the named insured under the Policy.
 
 
 6
 Clause 43 of the Policy authorized Tradeline to issue to its customers "evidence of insurance" in the form of Certificates or Special Policies of Insurance. This clause provides that "[t]he clauses appearing in this form shall be deemed to be included in Certificates and/or Special Policies of Insurance when issued under the authority granted in this clause." These Certificates or Special Policies were intended to provide Tradeline's customers with a way to make direct claims against New York Marine for loss or damage to insured cargo. Shortly after the Policy became effective, MMO forwarded to Tradeline pre-printed Certificates for issuance to its customers.
 
 C. The Tradeline-Deepak Contract
 
 7
 In April 1998, Deepak purchased two shipments of diammonium phosphate from Tradeline, in the amounts of 28,000 metric tons ("MT") and 21,509.155 MT. Both shipments were to be carried from Mexico to the sole port of discharge at Kandla, India aboard the M/V Sea Guardian, a vessel chartered by Tradeline.
 
 
 8
 The DAP was purchased on "CIF" (cost, insurance and freight) terms for $220 per metric ton, for a total price of $10,892,014.10. Tradeline was bound by the terms of its contract with Deepak to maintain insurance on the cargo on a warehouse to warehouse basis and to sell insurance to Deepak for the risks associated with the transit. Therefore, Tradeline delivered to Deepak Special Marine Policies ("SMPs") 367 and 368 as evidence of the insurance on the DAP shipments, issued pursuant to its power under Clause 43 of the Policy. In addition to the preprinted provisions, both SMPs contained a typed provision that stated, "[n]otwithstanding anything contained herein to the contrary: Average Terms & Conditions: London ICC Clauses (C), London War Clauses (cargo), London Strikes Clauses (cargo)." Deepak fulfilled its obligation to Tradeline under the contract, having paid to Tradeline the full purchase price of the DAP.
 
 
 9
 D. The Voyage and Request for Rainwater Coverage
 
 
 10
 On or about April 18, 1998, the two shipments of DAP were loaded aboard the M/V Sea Guardian at the port of Lazaro Cardenas, Mexico, under two Bills of Lading. The port of Kandla, India was agreed upon by Deepak and Tradeline as the sole port of discharge.
 
 
 11
 On May 28 or 29, 1998, the M/V Sea Guardian arrived at the Port of Kandla, and, because of draft restrictions at the berth, began to load the DAP onto lightering barges for transit to the wharf at Kandla. The lightering process continued through June 8, 1998, and the offloaded DAP was located on the wharf or at other locations within the port trust area, where the DAP was being bagged by Rishi Shipping ("Rishi"), Deepak's handling and forwarding agent.
 
 
 12
 Meanwhile, on May 28, 1998, Deepak was informed by Rishi that "weather is cloudy and we shouldn't take risk of rain." The next day, Rishi again informed Deepak by facsimile that insurance for rain was necessary. Deepak forwarded this fax to Tradeline on that same day, with a handwritten note, "please do the needful immediately." Deepak advised Tradeline, shortly after this communication, that it did not wish to insure for the more expensive all risks coverage under Institute Cargo Clauses (A) ("ICC(A)"), but rather wished to add rainwater coverage to the existing coverage. Deepak also wished only to cover 21,000 MT of the entire shipment.
 
 
 13
 On June 1, 1998, Tradeline inquired of Frenkel whether it could obtain an upgrade to include the risk of rainwater. Specifically, Tradeline asked if ICC(A) terms covering only rainwater damage could be obtained, whether rainwater coverage could be added to the existing ICC(C) coverage, and whether rainwater damage could be obtained for only part of the total DAP shipment. On June 5, 1998, after various communications between Tradeline and Frenkel, and Frenkel and MMO, MMO set the rate for an upgrade of ICC(C) coverage to include risk of rainwater damage at 1.5 cents per $100 of insured value. On June 8, 1998, Deepak informed Tradeline that it accepted these quoted terms and Tradeline issued new SMPs shortly thereafter. The new SMPs contained a revised typewritten provision stating:
 
 
 14
 Notwithstanding anything contained herein to the contrary: Average terms & conditions:
 
 London ICC clauses (C)
 London War Clauses (cargo)
 
 15
 London Strike Clauses (cargo)including risks of rainwater damages, with effect from 5th June 1998.
 
 
 16
 Claims payable in India.
 
 
 17
 Frenkel approved these SMPs 377 and 378 to replace SMPs 367 and 368, with the new coverage to be effective June 5, 1998. Tradeline wrote "cancelled" on SMPs 367 and 368.
 
 
 18
 On June 9, 1998, while the DAP was still being discharged, a cyclone struck the port of Kandla, involving cyclonic wind and rain forces, tidal waves and rising waters. When the cyclone struck, approximately 12,500 MT had been offloaded from the M/V Sea Guardian. About 5,000 MT were already bagged and transported to other inland locations. The M/V Sea Guardian, with approximately 36,500 MT of DAP still on board, was diverted from the port of Kandla, which was closed due to the cyclone, to the distress port of JNPT, India.
 
 
 19
 On June 12, 1998, Deepak gave notice of loss stemming from the cyclone to New York Marine through Frenkel. Shortly thereafter, MMO, on behalf of New York Marine, retained Tata Marine Services, who in turn hired J.B. Boda Surveyors Ltd. to assess the extent of the damage to the DAP shipment.
 
 E. Undisputed Losses Incurred by Deepak
 
 20
 Deepak suffered seven separate categories of damages. First, 1,650 MT of DAP were lost as the result of the sinking of lightering barges in the port of Kandla, amounting to a claim of $399,300. Second, 1,054.06 MT of DAP were lost in the shore area of the port of Kandla as a result of the cyclone rains, rising tides, and tidal waves of 9 meters, resulting in a claim of $255,082.52. Third, 2,672.92 MT of DAP were damaged by the cyclone and resulting floods in the port trust area of Kandla. The DAP had been deposited from the lightering barges onto the shore area. The loss amounted to $471,978.24, which represents the difference in insured value less the monies received after a salvage sale. Fourth, Deepak incurred mitigation expenses in segregating and reconditioning the damaged DAP, cost of replacement bags, additional transportation costs and extra overhead for the salvage operations amounting to $30,703.87. Fifth, Deepak incurred forwarding, landing and storage costs for diverting the cargo to the port of distress, JNPT, in the amount of $280,754.89 ($247,463.39 for additional wharfage, statutory port charges, demurrage, cost of excavators, customs overtime, manual bagging charges statutorily imposed, additional supervision, cost of transporting empty bags to JNPT and survey costs plus $33,291.50 toward the cost of moving the vessel from Kandla to JNPT). Sixth, 566.53 MT of DAP were damaged by rain water at the port of JNPT, resulting in a loss of $100,454.48, the difference in insured value less the monies received for the salvage sale. Seventh, 47.85 MT of DAP was lost during the discharge of the shipments at the port of distress, in the amount of $11,579,70.
 
 
 21
 Total losses claimed amount to $1,549,853.70. By letter dated September 21, 1998, MMO declined Deepak's claim in its entirety.
 
 F. Proceedings Below
 
 22
 Because this complex appeal raises several issues among several parties, we set forth the claims, counterclaims and third-party claims in some detail.
 
 
 23
 On October 30, 1998, New York Marine brought a declaratory judgment action against Tradeline and Deepak, seeking a declaration that the Policy was void ab initio. New York Marine claimed that the defendants violated the duty of utmost good faith when they sought to add rainwater coverage, by failing to inform New York Marine that the DAP was in route, that two DAP shipments were aboard the same vessel, and that dire weather was predicted.
 
 
 24
 Tradeline and Deepak counter-claimed against New York Marine, alleging that New York Marine breached the Policy by failing to pay Deepak's claim and, in addition to compensatory damages, prayed for punitive damages based on New York Marine's alleged bad faith in denying the claims under the Policy. Deepak filed a cross-claim against Tradeline for breach of the CIF sales contract. Tradeline also filed a third- party complaint against MMO, New York Marine's agent, alleging that MMO breached its duty of good faith by causing Deepak's claim to be wrongfully denied.
 
 
 25
 New York Marine filed a third-party complaint against Frenkel, alleging that Frenkel misrepresented or failed to disclose to New York Marine material facts regarding the requested rainwater coverage upgrade and that it permitted unauthorized SMPs to issue.
 
 
 26
 On motions for summary judgment filed by Deepak, Tradeline, and Frenkel and on New York Marine's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the district court dismissed Tradeline's and Deepak's claims for punitive damages, but denied all the remaining motions because disputed questions of material fact existed. See New York Marine & General Ins. Co. v. Tradeline (L.L.C.), No. 98 Civ. 7840(HB), 1999 WL 1277244, at *4-*6 (S.D.N.Y. Nov. 29, 1999) ("New York Marine I").[2] In deciding the parties' motions for summary judgment, the district court concluded that, despite the choice of law provision in the Policy calling for application of English law, New York law applied. See New York Marine I, 1999 WL 1277244, at *3. The parties do not dispute this conclusion and have set forth their arguments on appeal based on New York law.
 
 
 27
 Following a bench trial, the district court rejected New York Marine's claim that the Policy was void ab initio. See New York Marine & General Ins. Co. v. Tradeline (L.L.C.), No. 98 Civ. 7840(HB), 2000 WL 739567, at *9 (S.D.N.Y. June 7, 2000) ("New York Marine II"). The district court did conclude, however, that Tradeline and Deepak would not get the benefit of the rainwater coverage evidenced by SMPs 377 and 378 because they violated the duty of utmost good faith by not disclosing the weather conditions to New York Marine or MMO. See id. at *8-*10. Therefore, the district court awarded to Deepak that part of its claim covered by the Policy and the original SMPs (367 and 368), which, the district court concluded, amounted to $410,879.70. See id. at *10-*11. The district court dismissed New York Marine's third-party complaint against Frenkel, as well as Deepak's cross-claim against Tradeline. See id. at *12. Finally, the district court denied Deepak's and Tradeline's requests for attorneys' fees, finding no evidence of bad faith on the part of New York Marine and concluding that Deepak was not "truly successful" in defending New York Marine's declaratory suit, "having prevailed only to a modest degree." See id.
 
 
 28
 The parties filed timely appeals.
 
 II. DISCUSSION
 
 29
 On appeal, Deepak's principal argument is that the district court misinterpreted the Policy, thereby erroneously failing to accord it full recovery on its claim. Deepak also contests other determinations made by the district court regarding evidence, agency relationships between the parties, dismissal of its contract claim against Tradeline, and the pre-judgment interest rate to be applied to its recovery.
 
 
 30
 New York Marine and MMO cross-appeal, contending, as they did below, that the Policy was void ab initio. Tradeline likewise cross-appeals, and echoes Deepak's principal argument.[3]
 
 
 31
 A. Jurisdiction, Standard of Review and Choice of Law
 
 
 32
 Federal subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331, which provides federal district courts with original jurisdiction over "any civil case of admiralty or maritime jurisdiction." Federal admiralty jurisdiction extends to cases involving marine insurance contracts. See Advani Enters., Inc. v. Underwriters at Lloyd's, 140 F.3d 157, 161 (2d Cir. 1998).
 
 
 33
 Although we review a district court's findings of fact for clear error, see Atlantic Mut. Ins. Co. v. Balfour MacLaine Int'l Ltd. (In re Balfour MacLaine Int'l Ltd.), 85 F.3d 68, 74 (2d Cir. 1996), we review a district court's construction of an insurance policy de novo, see Commercial Union Ins. Co. v. Flagship Marine Servs., Inc., 190 F.3d 26, 30 (2d Cir. 1999). "Absent a specific federal rule, federal courts look to state law for principles governing maritime insurance policies... and apply federal maritime choice of law rules to determine which state's law to apply." Id. (citing Wilburn Boat Co. v. Fireman's Fund Ins., 348 U.S. 310, 319-21 (1955) and Advani Enters., 140 F.3d at 162). Here, as earlier indicated, the district court concluded that New York law governed interpretation of the Policy, and the parties do not contend otherwise.
 
 B. The Status of the Policy
 
 34
 New York Marine's principal contention below was that Deepak and Tradeline violated the doctrine of uberrimae fidae, the duty of utmost good faith, by failing to disclose to MMO or New York Marine the status of the DAP shipments and the weather predictions when Deepak sought rainwater coverage. Because of this failure to disclose, New York Marine argued, the entire policy was void ab initio, and Deepak should recover nothing on its claim. The district court agreed that Deepak and Tradeline had violated this duty, but held that the entire policy was not void; instead, only the SMPs issued with rainwater coverage were void. See New York Marine II, 2000 WL 739567, at *7-*10.
 
 
 35
 On appeal, New York Marine again urges that the entire policy is void. Deepak, on the other hand, argues that it violated no duty, because it disclosed to Tradeline the existence of bad weather at the port of Kandla and that any knowledge possessed by Tradeline is imputed to New York Marine, because Tradeline was acting as New York Marine's agent with respect to the issuance of the SMPs. Because we agree with Deepak's argument that Tradeline was acting as New York Marine's agent, we reverse the district court's holding with respect to Deepak's duty of utmost good faith.
 
 1. Agency
 
 36
 New York common law provides that an agency relationship "results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." Meese v. Miller, 79 A.D.2d 237, 242, 436 N.Y.S.2d 496, 499 (4th Dep't 1981); see also Pensee Assocs., Ltd. v. Quon Indus., Ltd., 241 A.D.2d 354, 359, 660 N.Y.S.2d 563, 566-67 (1st Dep't 1997) (same). Under New York law, knowledge acquired by an agent acting within the scope of its agency is imputed to the principal, even if the information was never actually communicated. See Christopher S. v. Douglaston Club, 275 A.D.2d 768, 769, 713 N.Y.S.2d 542, 543 (2d Dep't 2000).
 
 
 37
 Clause 43 of the Policy explicitly grants authority to Tradeline to issue "Special Policies of Insurance" for shipments covered by the Policy, manifesting New York Marine's consent to Tradeline acting on its behalf. When Tradeline issued, upon Deepak's request, SMPs 377 and 378, which included rainwater coverage, it consented to act as New York Marine's agent with respect to this transaction. There is no question that Tradeline was under New York Marine's control in issuing the SMPs - Tradeline communicated with New York Marine's managing general agent, MMO, in acquiring and setting the premium for the coverage. Therefore, Tradeline acted as New York Marine's agent in issuing both the original SMPs (367 and 368) and the rainwater coverage SMPs (377 and 378). Knowledge possessed by Tradeline regarding the location of the vessel and the weather predictions will thus be imputed to New York Marine.
 
 
 38
 Perzy v. Intercargo Corp., 827 F. Supp. 1365 (N.D. Ill. 1993) is instructive. Perzy involved a marine insurance dispute between Edwin Perzy, a manufacturer and seller of snowball paperweights, and Intercargo Corporation, an insurance company. See id. at 1368-69. A customer of Perzy in California sought to return unsold snowball paperweights to Perzy in Vienna, and enlisted a freight forwarder to arrange for shipment and insurance of the paperweights. See id. at 1368. The freight forwarder sent to Perzy a "Certificate of Marine Insurance" stating that it covered the shipped cargo. See id. at 1369. When the paperweights arrived in Vienna in a frozen and damaged condition, Perzy filed an insurance claim which Intercargo denied. See id. In addressing the parties' motions for summary judgment, the district court noted that the freight forwarder was likely acting as Intercargo's agent in the original placement of the insurance coverage. See id. at 1374. Intercargo contended that the freight forwarder was acting as Perzy's agent, to which the district court responded,
 
 
 39
 it is beyond dispute that even if [the freight forwarder] may also have been serving as Perzy's agent when she purchased insurance, in all events she was surely Intercargo's agent in that respect. Before Perzy had ever entered the picture Intercargo had given [the freight forwarder] the authority to write insurance policies with Intercargo as insurer.
 
 
 40
 Id. at 1377 (emphasis in original). The court further noted that Intercargo controlled the policy's terms, and that the freight forwarder worked on Intercargo's behalf in writing certificates for it. See id.
 
 
 41
 Here, too, the relationship between Tradeline and New York Marine commenced prior to Deepak's DAP shipments. As we noted earlier, Tradeline was authorized under Clause 43 to issue "Special Policies of Insurance," but New York Marine generally controlled the terms of the Policy and set the premiums. We therefore conclude that Tradeline was acting as New York Marine's agent when it sought the price for rainwater coverage and subsequently issued the updated SMPs. Any knowledge possessed by Tradeline in issuing the SMPs will be imputed to New York Marine, as the principal.
 
 
 42
 2. Application of the Doctrine of Uberrimae Fidae
 
 
 43
 "[P]arties to a marine insurance contract are held to the highest degree of good faith. Under this obligation, called uberrimae fidae, the party seeking insurance is required to disclose all circumstances known to him which materially affect the risk." Puritan Ins. Co. v. Eagle Steamship Co. S.A., 779 F.2d 866, 870 (2d Cir. 1985). Uberrimae fidae, the duty of utmost good faith, requires an assured to disclose any information that materially affects the risk being insured, because the assured is more likely to be aware of such information. See Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 13 (2d Cir. 1986). A non-disclosed fact is material if it would have affected the insurer's decision to insure at all or at a particular premium. See Mutual Benefit Life Ins. Co. v. JMR Elecs. Corp., 848 F.2d 30, 32-33 (2d Cir. 1988).
 
 
 44
 The district court found, and we agree, that the prediction of severe rainy weather in the Kandla area is a material fact that would have affected New York Marine's decision whether to issue the extended coverage at all or to do so at a higher premium. See New York Marine II, 2000 WL 739567, at *7-*8. Deepak, therefore, had a duty to disclose this information when seeking the rainwater coverage.
 
 
 45
 The record includes a letter sent by fax from Deepak to Tradeline which references the impending rainy weather at Kandla. Tradeline does not dispute that it received this letter. Tradeline was therefore aware of the material weather information, and this knowledge is imputed to New York Marine. Deepak fulfilled its duty of utmost good faith by informing Tradeline, as New York Marine's agent, of the material circumstances. We therefore conclude that uberrimae fidae does not void SMPs 377 and 378, and that Deepak can recover any loss covered by those SMPs. As we conclude below, however, Deepak is not entitled to full recovery, even under SMPs 377 and 378.[4]
 
 
 46
 C. Deepak's Recovery under Open Cargo Policy No. 10490MC594
 
 1. The Governing Terms of the Policy
 
 47
 Both the original and the rainwater SMPs contain the phrase, "[n]otwithstanding anything contained herein to the contrary: Average terms & conditions: London ICC Clauses (C)." The district court concluded that this phrase "is unambiguous and resolves all potential conflicts [between Policy and ICC(C) provisions] in favor of the provisions outlined in the ICC(C) clauses." New York Marine II, 2000 WL 739567, at *6. On appeal, Deepak challenges this conclusion and contends that the Policy's manuscripted clauses, along with the attached endorsements, trump the pre-printed ICC(C) clauses referenced in the SMPs. We reject Deepak's challenge and conclude that the ICC(C) provisions govern Deepak's claim under the Policy.[5]
 
 
 48
 In support of its argument, Deepak invokes several of the Policy's provisions. The first, Clause 48, provides that "[i]t is further agreed that the terms, conditions and limits contained herein (clauses 1 to 47 inclusive) shall supersede those of the printed policy to which this form is attached wherever the same may conflict." Second, Clause 11(G) provides that "[i]n the event that broader terms or conditions appear in a policy, special policy, [or] certificate... which has been accepted by this Assurer, then such terms and conditions shall be applicable." Third, Clause 43, which authorizes Tradeline to issue SMPs, provides that the "clauses appearing in this form shall be deemed to be included in Certificates and/or Special Policies of Insurance when issued under the authority granted in this clause." Finally, the SMPs were issued "subject to conditions of Open Policy No. 10490MC594." Deepak contends that the combined effect of these clauses demonstrate that the parties intended, where any conflict in terms arise, the broader terms and conditions to govern coverage. Additionally, Deepak cites rules of insurance policy interpretation, which require conflicts to be interpreted against the insurer and which require courts to afford broader coverage where the policy contains conflicting clauses. Therefore, Deepak argues that the manuscripted Policy clauses are given effect over the ICC(C) clauses.
 
 
 49
 We reject this contention. Although it is true, as a general rule, that "where a certificate states expressly that it is subject to the terms and conditions of the policy, the language of the policy controls," Taylor v. Kinsella, 742 F.2d 709, 711 (2d Cir. 1984), the certificates (SMPs) at issue here include typewritten, not pre-printed, provisions limiting the terms of the coverage to ICC(C) clauses. Typewritten statements in an insurance policy will prevail over stock or pre-printed forms. See, e.g., Perth Amboy Drydock Co. v. N.J. Mfrs. Ins. Co., 26 A.D.2d 517, 517-18, 270 N.Y.S.2d 819, 820-21 (1st Dep't 1966); see also 2 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 22:4 n.34 (3d ed. 1996) ("Couch on Insurance") ("Written or typed portion of a policy must be taken as more immediate or deliberate expression of intention than the printed portion if there is any repugnancy or conflict between them; written or typed portion prevails."). The typewritten statements in the SMPs, adopting the ICC(C) provisions as governing terms, control where there are conflicts.
 
 
 50
 We agree with the district court that these typewritten provisions modify both the "average terms and conditions" paragraph contained in the SMPs and Clause 11 of the Policy, also entitled "average terms and conditions." See New York Marine II, 2000 WL 739567, at *5. First, the SMPs were issued pursuant to Tradeline's authority under the Policy, and the SMPs specifically state that they are subject to the conditions of the Policy. Clause 11(A), modified by Endorsement Nine, contemplates that the Assured will choose either ICC(C) coverage or ICC(A) coverage:
 
 
 51
 All goods and/or merchandise... are insured:
 
 
 52
 Cement clinker, sulphur, rock phosphate, bentonite, barytes, scrap metal, ammonia, diammonium phosphate, urea, silicon sand, salt, soyabean and rice in bulk are insured:
 
 
 53
 I. Institute Cargo Clause (C) and all claims for shortage and/or leakage are subject to a deductible of one-half of one percent (½ of 1%) of the insured value.
 
 
 54
 or, if declared by the Assured prior to know [sic] or reported loss.
 
 
 55
 II. Per Institute Cargo Clauses (A). All claims subject to a deductible of 2% of the insured value.
 
 
 56
 The original, unamended Clause 11(A) provided for no such choice, and dictated the level of coverage. When Tradeline and Deepak chose ICC(C) coverage in the CIF sales contract, and Tradeline incorporated this choice into the SMPs, it incorporated the ICC(C) terms into the Policy to govern coverage.
 
 
 57
 Clauses 11(G) and 48 do not require the opposite result. Clause 11(G) states that "[i]n the event that broader terms... appear in a policy, special policy, [or] certificate... then such terms and conditions shall be applicable." Clause 11(G) contemplates the situation where the SMPs contain broader terms than the Policy and states that the broader terms control. Here, the Policy itself contains broader terms than the SMPs. The SMPs' additional "notwithstanding anything contained herein" language plainly supersedes the broader Policy provisions. Also, as the district court recognized, if Clause 11(G) required that the Policy's broader terms were always applicable, Tradeline could never insure any shipment for less than all-risks coverage. See New York Marine II, 2000 WL 739567, at *5. As noted earlier, such an outcome directly contravenes Endorsement Nine, which allows the assured to choose the level of coverage.
 
 
 58
 Deepak's argument for broader coverage based on Clause 48, which provides that clauses 1 through 47 of the Policy supersede clauses contained in the "printed policy" in cases of conflict, fails for the same reason. If the phrase "printed policy" refers either to the SMPs issued pursuant to Clause 43 or to the ICC(C) pre-printed provisions which were attached to the open policy, then the Policy would, in effect, always provide one level of coverage, notwithstanding the choices later made by the insured party with respect to a specific shipment. This result would ignore both Clause 11(G), which allows, for an additional premium, broader coverage than that provided in the Policy, and Endorsement Nine, which allows the insured to choose between either ICC(C) or ICC(A) coverage. We refuse to interpret a contractual term in such a way as to nullify other provisions. Cf. 2 Couch on Insurance § 21:19 ("[T]he expressed intent of the parties is to be ascertained by examining the... policy as a whole.... [T]he policy must be construed in its entirety, with each clause interpreted in relation to others contained therein. All its words, parts, and provisions must be construed together as one entire contract, each part interpreted in the light of all the other parts[.]") (footnotes omitted).
 
 
 59
 We therefore conclude that the terms governing the DAP shipments are contained in the ICC(C) provisions, with the addition of rainwater damage as a covered risk. We now examine those provisions to determine what portion of Deepak's claim is covered by the Policy.
 
 2. Deepak's Recovery under the Policy
 
 60
 Thus far, we have concluded that the ICC(C) provisions contain the governing terms of the Policy with respect to the DAP shipments at issue here. Additionally, contrary to decision of the district court, we have concluded that, because Tradeline was acting as New York Marine's agent in issuing SMPs 377 and 378 and Deepak fully informed Tradeline of the circumstances surrounding the request for rainwater coverage, Deepak did not violate its duty of uberrimae fidae owed to New York Marine. Therefore, we will now ascertain which aspects of Deepak's claim are covered by the Policy as amended by SMPs 377 and 378.
 
 
 61
 Deepak asserts that it is an assured under the Policy, and New York Marine does not dispute this assertion. We agree that Deepak is an assured. Clause 1 of the Policy provides the Policy is "[f]or account of whom it may concern." "Insurance carried for the account of `whom it may concern' covers anyone having an insurable interest in the insured property at the time of the happening of the loss." The John Russell, 68 F.2d 901, 902 (2d Cir. 1934). Endorsement Nine of the Policy specifically lists diammonium phosphate as a good covered by the Policy. Coverage of the DAP attached automatically to the two shipments upon commencement of transit, as provided by Clause 4 of the Policy which states "[t]his policy attaches to all shipments made on or after May 9, 1994."
 
 
 62
 The district court awarded to Deepak $399,300 in connection with the DAP lost due to the sinking of the lightering barge in the port of Kandla. Additionally, the district court awarded $11,579.70 in connection with the DAP lost during discharge at JNPT, the port of distress. See New York Marine II, 2000 WL 739567, at *10-*11. New York Marine concedes that, if Deepak was entitled to insurance coverage, the district court was correct in awarding these two categories of damages under the Policy.
 
 
 63
 Our focus, therefore, is whether Deepak is entitled to recover for any other losses incurred. Clause 1 delineates the risks covered, which include loss or damage due to (a) fire or explosion; (b) a stranded, grounded, sunk or capsized vessel; (c) collision of the vessel with "any external object;" or (d) discharge of cargo at a port of distress. SMPs 377 and 378 modify this clause by adding the risk of rainwater damage. Clause 8 of the ICC(C) terms outlines the duration of insurance coverage. This Clause provides that the insurance coverage commenced from the time the DAP left Tradeline's warehouse and "continue[d] during the ordinary course of transit" and terminated either (1) on delivery to the final warehouse or storage site at the named destination; or (2) on delivery to any other warehouse or storage site,
 
 
 64
 whether prior to or at the destination named herein, which the Assured elect[ed] to use either for storage other than in the ordinary course of transit or for allocation or distribution or on the expiry of 60 days after completion of discharge overside of the goods hereby insured.
 
 
 65
 Deepak seeks to recover $255,082.52 for 1,056.06 MT of DAP that had been deposited from the lightering barges onto the shore area and was washed away as a result of rising tides and tidal waves. Additionally, Deepak claims $471,978.24 for DAP that was damaged by the cyclone on the shore of Kandla. The district court concluded that these two claims were not covered. See New York Marine II, 2000 WL 739567, at *10. We agree.
 
 
 66
 Although the SMPs 377 and 378 amended Clause 1 of the ICC(C) provisions to include the risk of rainwater damage, the SMPs did nothing to alter Clause 8, the duration clause, which terminates coverage upon delivery to any site, either prior to or at the named destination, used for storage or distribution allocation. Therefore, once the DAP had been offloaded from the M/V Sea Guardian onto the shore area into the custody of Rishi Shipping, Deepak's clearing and forwarding agent, the DAP had been delivered to "any other warehouse of place of storage" and was no longer in the "ordinary course of transit" under Clause 8. At that point, the insurance coverage terminated, and any loss or damage at that point cannot be recovered under the Policy. See Jomark Textiles, Inc. v. Int'l Fire and Marine Ins. Co., Ltd., 771 F. Supp. 577, 580 (S.D.N.Y. 1989) (interpreting policy provision virtually identical to Clause 8 and holding that where the insured "exercised dominion and control over the goods, they were no longer in-transit as a matter of law, and therefore, were no longer covered by the... policy"); see also Lumber & Wood Prods., Inc. v. N.H. Ins. Co., 807 F.2d 916, 919-20 (11th Cir. 1987) (same).
 
 
 67
 Clause 12 of the Policy, which provides for broader "warehouse to warehouse" coverage does not affect our determination of Deepak's coverage with respect to these two claims, because, as we concluded earlier, where there are conflicts between ICC(C) provisions and the Policy provisions, the ICC(C) provisions control. Similar reasoning defeats Deepak's arguments for coverage which invoke Clause 17 of the Policy, entitled "Shore Coverage," providing that "where this insurance covers on goods while on any land conveyance and/or while on docks, wharves, quays, or elsewhere on the shore, the perils insured against include... cyclone,... flood, [and] rising waters." This clause does not apply here, because such shore coverage was not included in the insurance covering the DAP shipments, as demonstrated by the SMPs' adoption of ICC(C) terms. We therefore agree with the district court that New York Marine is not liable under the Policy, as amended by the SMPs, for either the approximately 1056 MT of DAP washed away on the shore of Kandla or the approximately 2672 MT of DAP damaged while at the shore area at Kandla.
 
 
 68
 The next category of loss claimed by Deepak amounts to $30,703.87 in salvage and reconditioning costs for the DAP damaged at the shore of Kandla. The district court concluded that, because the damage itself was not covered under the Policy, the costs incurred in salvage efforts were likewise not covered. See New York Marine II, 2000 WL 739567, at *11. Deepak challenges this conclusion on appeal, and contends that Clause 41 of the Policy allows it to recover these costs. Clause 41 requires the assured to undertake mitigation efforts without jeopardizing the insurance coverage and provides that the mitigation costs are recoverable.[6] We reject Deepak's Clause 41 argument. The costs incurred by Deepak in salvage efforts are not covered under the Policy, because the DAP itself was not covered when the damage occurred. As we outlined earlier, the DAP was ashore at that point and, therefore, this damage was not covered by virtue of ICC(C) Clause 8.
 
 
 69
 Next, Deepak claims that it should have been awarded recovery for forwarding, landing and storage expenses incurred at the port of distress, JNPT and for rainwater damage to 566.53 MT of DAP caused by a leak in a silo at JNPT. The district court concluded that these costs were not covered under the Policy and that, under ICC(C) terms, Deepak could instead recover only for loss of or damage to the DAP itself at the port of distress. See New York Marine II, 2000 WL 729567, at *11. On appeal, Deepak invokes Clause 12 of the ICC(C) provisions. Clause 12 of the ICC(C) terms states:
 
 
 70
 Where, as a result of the operation of a risk covered by this insurance, the insured transit is terminated at a port or place other than that to which the subject- matter is covered under this insurance, the Underwriters will reimburse the Assured for any extra charges properly and reasonably incurred in unloading[,] storing and forwarding the subject-matter to the destination to which it is insured hereunder.
 
 
 71
 This Clause 12, which does not apply to general average or salvage charges, shall be subject to the exclusions contained in Clauses 4, 5, 6 and 7 above, and shall not include charges arising from the fault[,] negligence[,] insolvency or financial default of the Assured or their [sic] servants. (Emphasis added.)
 
 
 72
 To determine the import of this Clause, we must first ascertain whether the DAP was forwarded to JNPT, the port of distress, "as a result of the operation of a risk covered by this insurance." Clause 1 of the ICC(C) terms includes as a covered risk "loss of or damage to the subject-matter insured reasonably attributable to discharge of cargo at a port of distress." Additionally, SMPs 377 and 378 adds rainwater damage as a covered risk. Deepak therefore argues that the movement of the M/V Sea Guardian, because of heavy rainfall, from Kandla to JNPT as a port of distress triggered coverage under Clause 12.[7]
 
 
 73
 We do not agree that Clause 12 of the ICC(C) terms provides coverage to Deepak for those "extra charges properly and reasonably incurred in unloading[,] storing and forwarding the subject-matter to the destination to which" the DAP was insured. As New York Marine contended at oral argument, the expenses incurred by Deepak in diverting the DAP to JNPT were not incurred as a result of loss or damage to the DAP "reasonably attributable to discharge of cargo at a port of distress." Neither was the vessel diverted to JNPT as a result of rainwater damage to the DAP. Instead, the expenses were incurred as a result of the closure of the port at Kandla due to the cyclonic weather. Risks covered under the Policy include neither port closure nor cyclones. Therefore, we cannot conclude that the expenses incurred in the diversion to JNPT occurred as a "result of the operation of a risk covered." New York Marine is therefore not liable to Deepak for these costs.
 
 
 74
 Next, Deepak claims that it should recover for the rainwater damage to approximately 566 MT of DAP that occurred during storage in a silo at JNPT. As we noted earlier, SMPs 377 and 378 cover rainwater damages. Because we cannot ascertain, however, whether this DAP was still "in transit" under ICC(C) Clause 8, we remand to the district court for a determination regarding whether this DAP was covered under the Policy given this clauses duration limitations. Deepak contends that this DAP was damaged in part because of the negligence of the stevedores or of the port facilities at JNTP. Such a contention raises questions concerning whether, at that point, the DAP was in "the ordinary course of transit" or had instead been stored, at Deepak's direction, "other than in the ordinary course of transit." We distinguish this claim for damage from the damage which occurred at the port of Kandla, because in the latter instance, the offloaded DAP was being handled by Rishi Shipping, a clearing and forwarding agent hired by Deepak. This fact clearly shows that the DAP was damaged in the shore area at Kandla outside the duration described in ICC(C) Clause 8. Therefore, on remand the district court must ascertain if coverage had indeed terminated because the DAP in the JNPT silo was delivered to "any other warehouse or place of storage, whether prior to or at the destination named herein, which [Deepak] elect[ed] to use either for storage other than in the ordinary course of transit or for allocation or distribution."
 
 D. The Tradeline-Deepak CIF Sales Contract
 
 75
 Deepak contends on appeal, as it did below, that Tradeline breached the CIF sales contract by improperly writing the SMPs and thereby limiting Deepak's insurance coverage to the ICC(C) clauses. The district court rejected this claim, and concluded that Tradeline fulfilled its obligations under the CIF contract. We agree with the district court.
 
 
 76
 "[U]nder a CIF contract [] the seller fulfills his obligation simply by loading the cargo and forwarding to the buyer a bill of lading and insurance certificate." Nat'l Am. Corp. v. Fed. Republic of Nigeria, 597 F.2d 314, 321 (2d Cir. 1979). Ferromontan, Inc. v. Georgetown Steel Corp., 535 F. Supp. 1198, 1211 (D.S.C. 1982), cited by Deepak, provides no support for Deepak's position. In Ferromontan, the plaintiff, a steel broker, was contractually obligated to procure cargo insurance covering the interests of the defendant, a steel manufacturer and shipper, but failed to provide insurance which named the defendant as an assured or to provide insurance coverage of the defendants' risks. See id. at 1203. The district court in Ferromontan concluded that the plaintiff had breached its contract with the defendant. See id. at 1211.
 
 
 77
 Here, Tradeline loaded the DAP shipments aboard the M/V Sea Guardian, issued two bills of landing and issued two certificates of insurance, the SMPs 367 and 368 (later replaced by SMPs 377 and 378). Tradeline apparently fulfilled all its obligations under the CIF contract. Examination of the terms of the specific CIF contract at issue reveals that Tradeline provided exactly the type of insurance outlined in the contract. Clause 8 of the CIF contract states that Tradeline is to
 
 
 78
 cover insurance and give details to [Deepak] prior to commencement of loading. The insurance cover shall be provided by a reputed international insurance firm to cover 110% of C.I.F. value of the ordered cargo covering the following risks: a) London ICC Clauses (C)[;] b) London War Clauses (Cargo)[;] c) London Strikes Clauses (Cargo).
 
 
 79
 Under the contract, Tradeline was obligated to supply insurance providing ICC(C) coverage and, under either set of SMPs, it did so. We affirm the district court's dismissal of Deepak's breach of contract claim against Tradeline.
 
 E. Attorneys' Fees
 
 80
 Deepak appeals the district court's denial of attorneys' fees, contending that it is entitled to full reimbursement because it was "dragged halfway around the world and... cast in a defensive posture by the insurer [New York Marine] simply because [New York Marine] did not wish to live up to its contractual obligations."
 
 
 81
 Generally, attorneys' fees awards in admiralty suits are discretionary and based on a finding of bad faith. See Ingersoll Milling Machine Co. v. M/V Bodena, 829 F.2d 293, 309 (2d Cir. 1987). Additionally, "[u]nder New York law, it is well settled that an insured cannot recover his legal expenses in a controversy with a carrier over coverage, even though the carrier loses the controversy and is held responsible for the risk." Employers Mut. Cas. Co. v. Key Pharms., 75 F.3d 815, 824 (2d Cir. 1996). "[A] policyholder may recover attorney's fees, when he has been cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations." Id. (internal quotation marks and citation omitted). This "exception arises when a policyholder has been cast in a defensive posture by its insurer in a dispute over the insurer's duty to defend." Id.
 
 
 82
 The district court refused to award attorneys' fees to Deepak and Tradeline, reasoning that (1) New York Marine did not act in bad faith in denying the claim or instituting the declaratory action; and (2) Deepak was not "truly successful" in defending this suit, because it only recovered a fraction of its claim. See New York Marine II, 2000 WL 739567, at *12. Although we conclude that Deepak may, on remand, be somewhat more successful in defending New York Marine's suit than did the district court, we will not disturb the district court's conclusions regarding attorneys' fees. The district court was well within its discretion in making this determination.
 
 F. Punitive Damages
 
 83
 Deepak alleges that New York Marine breached the Policy in bad faith, and therefore is liable to Deepak for punitive damages. The district court dismissed this claim, New York Marine I, 1999 WL 1277244, at *4, and we affirm the district court's dismissal.
 
 
 84
 Under New York law, punitive damages in a breach of contract claim are available if the plaintiff demonstrates (1) that the defendant's conduct is "actionable as an independent tort; (2) the tortious conduct must be of [an] egregious nature; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally." New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 316, 662 N.E.2d 763, 767, 639 N.Y.S.2d 283, 287 (1995).
 
 
 85
 The district court noted that Deepak's claim for punitive damages alleged no facts regarding the fourth prong, and Deepak alleges none on appeal. We therefore conclude that Deepak's punitive damages claim must fail.
 
 G. Pre-Judgment Interest Rate
 
 86
 The district court applied the United States Treasury Bill rate as provided in 28 U.S.C. § 1961(a). Deepak contends that this was error, and that the district court should have applied a 17% interest rate, representing what Deepak would have earned had it invested the money in India.
 
 
 87
 "[T]he rate of pre-judgment interest is within the broad discretion of the district court." Mentor Ins. Co., Ltd. v. Brannkasse, 996 F.2d 506, 520 (2d Cir. 1993). Interest is intended to make the injured party whole, see Mitsui & Co., Ltd. v. Am. Export Lines, Inc., 636 F.2d 807, 824 (2d Cir. 1981), and generally "should be measured by interest on short-term, risk-free obligations." Indep. Bulk Transport, Inc. v. Vessel "Morania Abaco", 676 F.2d 23, 27 (2d Cir. 1982).
 
 
 88
 United States Treasury Bills are such short-term, risk-free obligations. See Ingersoll Milling Machine Co. v. M/V Bodena, 829 F.2d 293, 311 (2d Cir. 1987). Deepak fails to demonstrate how its proffered 17% interest rate could be earned on similarly short-term and risk-free obligations. Further, and most importantly, Deepak has not demonstrated that the district court abused its broad discretion in applying the United States Treasury Bill rate in determining pre-judgment interest. We therefore affirm the district court's pre-judgment interest rate decision.
 
 III. CONCLUSION
 
 89
 For the foregoing reasons, we affirm the district court's dismissal of Deepak's breach of contract claim against Tradeline and the claims for punitive damages. We also affirm the district court's decisions with respect to attorneys' fees and pre-judgment interest. We reverse the district court's conclusion that Tradeline was not New York Marine's agent with respect to the Special Marine Policies issued to Deepak and that SMPs 377 and 378 were void, and remand for a determination of New York Marine's liability for the rainwater damage to the DAP stored in the silo at JNPT.
 
 
 
 NOTES:
 
 
 [1]
 The Institute Cargo Clauses (C), along with several other types of clauses, were developed in 1983 by the Institute of London Underwriters to replace the old Lloyd's S.G. (ship and goods) Policy. See 2 Thomas Schoenbaum, Admiralty and Maritime Law § 19-4 (3d ed. 2001).
 
 
 [2]
 The district court also dismissed Tradeline's claim of deceptive acts and practices under N.Y. Gen. Bus. Law § 349, concluding that the statute was inapplicable. See New York Marine, 1999 WL 1277244, at *5. Tradeline does not appeal this decision.
 
 
 [3]
 Frenkel filed a cross-appeal as well, asserting that New York Marine's third-party complaint against it should have been dismissed on its motion for summary judgment. At oral argument, Frenkel conceded that, because New York Marine had abandoned its claim against Frenkel, there was nothing for this Court to address with respect to Frenkel's cross-appeal.
 
 
 [4]
 The district court concluded that "even if a principal-agent relationship between Tradeline and New York Marine was created by Clause 43 of the Open Policy, Tradeline violated its duty of utmost good faith... by failing to disclose the weather conditions...." New York Marine II, 2000 WL 739567, at *9. We do not reach this issue here, because Deepak, the insured with respect to the DAP shipments, did disclose the relevant information. Because Tradeline was acting as New York Marine's agent, the issue is whether Tradeline fulfilled its obligations as New York Marine's agent, an issue not before this Court.
 
 
 [5]
 Additionally, we reject Deepak's contention that the district court, in construing the insurance policy, improperly admitted parol evidence, specifically the testimony of Anna Abruzzese, an underwriting secretary at MMO. While it is true that parol evidence is admissible only when an insurance policy is ambiguous, see In re Prudential Lines Inc., 158 F.3d 65, 77 (2d Cir. 1998), it is also true that this Court generally assumes that "improper evidence and comments have been rejected [by the trial court] when the trial is to the Court alone, at least absent a showing of substantial prejudice," United States v. Weldon, 384 F.2d 772, 774 (2d Cir. 1967); cf. McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1138 n.7 ("[I]t is for the district court to decide what evidence will aid its decision of the case before it, and determinations as to relevance, probative weight, and credibility will not be disturbed unless this discretion has been abused."). Deepak has not made the requisite showing in this case. The district court's decision indicates that it did not rely on Abbruzzese's interpretation of the Policy provisions.
 
 
 [6]
 Clause 41 states:
 In case of any imminent or actual loss or misfortune, it shall be lawful and necessary to and for the Assured, his or their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the goods and merchandise, or any part thereof without prejudice to this insurance; nor shall the acts of the Assured or this Assurer in recovering saving and preserving the property insured in case of disaster be considered a waiver or an acceptance of abandonment; to the charges whereof, this Assurer will contribute according to the rate and quantity of the sum hereby insured.
 
 
 [7]
 Deepak also invokes Clause 21 of the Policy, which echoes Clause 12 of the ICC(C) terms, and provides recovery for landing, warehousing, forwarding expenses and damage to cargo "reasonably attributable to transhipment or to discharge of cargo at port of distress." The Policy's Clause 21, however, provides broader coverage than does ICC(C)'s Clause 12. Because we determined earlier that where conflicts arise between the Policy's and ICC(C)'s terms, the ICC(C) terms prevail, we look only to ICC(C)'s Clause 12 to determine coverage.